## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

MINNESOTA INDEPENDENT EQUAL
ACCESS CORPORATION,

   Plaintiff,

v.        **MEMORANDUM OF LAW & ORDER**
         Civil File No. 10-2550 (MJD/SER)

SPRINT COMMUNICATIONS COMPANY, L.P.,

   Defendant.

Albert H. Kramer, APCC Services, and Christopher K. Sandberg, Lockridge Grindal Nauen PLLP, Counsel for Plaintiff.

Kevin M. Decker and Philip R. Schenkenberg, Briggs & Morgan, PA, Counsel for Defendant.

## I. INTRODUCTION

 This matter is before the Court on Defendant's Amended Motion for Stay [Docket No. 56], Plaintiff's Amended Motion to Dismiss Counterclaim [Docket No. 58], and Plaintiff's Motion for Partial Summary Judgment [Docket No. 63]. The Court heard oral argument on June 10, 2011. For the reasons that follow, the Court stays this matter and refers the issue of the applicability of MIEAC's FCC Tariff to the FCC under the primary jurisdiction doctrine.

## II.     BACKGROUND

### A.     Factual Background

#### 1.     The Parties

Plaintiff Minnesota Independent Equal Access Corporation ("MIEAC") is a

Minnesota corporation that provides interstate centralized equal access ("CEA")

services to long distance carrier customers, including Defendant Sprint

Communications Company, L.P., ("Sprint").  MIEAC provides CEA services by

delivering long distance carriers' originating and terminating traffic to and from

several dozen local exchange carriers ("LECs") – local telephone companies in

rural Minnesota that are connected to MIEAC's network.  MIEAC is the

intermediate link between the long distance carrier customers and the

Interconnected LECS and routes the calls through MIEAC's switches, known as

"tandem switches."  At issue in this case are interstate originating and

terminating CEA services that MIEAC provided to Sprint pursuant to MIEAC's

Federal Communications Commission ("FCC") Tariff.

Sprint is a Delaware limited partnership with its principal place of

business in Kansas that is an interexchange carrier ("IXC").  It provides wireline

long-distance telecommunications services to consumers by using its own

facilities when it can and by interconnecting with other telecommunications

carriers' telephone lines when necessary, to complete calls.  Usually, Sprint

purchases access services under a tariff that specifies the terms for receiving

access to another carrier's facilities.  Tariffs are filed with the FCC for interstate

calls and with the Minnesota Public Utilities Commission ("MPUC") for

intrastate calls.

### 2.      Billing Dispute Between MIEAC and Sprint

Beginning with MIEAC's May 1, 2009 invoice, for April 2009 traffic, and

continuing through the present, Sprint has refused to pay MIEAC's invoices for

CEA services.  MIEAC continues to provide originating and terminating CEA

services to Sprint.

Sprint disputes the nature of the traffic sent through MIEAC to one of the

Interconnected LECs – Tekstar Communications, Inc. ("Tekstar").  Sprint asserts

– as has been asserted in other lawsuits before this Court - that Tekstar has

arrangements with free conference calling or chat service provider customers –

known as call connection companies ("CCCs") – to generate incoming calls in

order to increase terminating access charge revenues for Tekstar.  Sprint further

asserts that Tekstar improperly shares its revenue with its CCC provider. This arrangement is known as "traffic pumping."

Sprint alleges the following scheme: an LEC (Tekstar) that is supposed to deliver calls to local, end user customers sets a high access rate to charge Sprint for using LEC facilities for switched access services, which Sprint accepts based on the assumption that there will be minimal telecommunications traffic to this rural area. The LEC then provides local phone numbers to non-local businesses that offer free or nearly free international calling, chat lines, or conference calling service, which causes the telecommunications traffic to soar. Sprint customers from across the country call the local number and the LEC, and MIEAC, if it is participating in moving the traffic, bill Sprint the high switched access service charge to deliver the traffic to the international calling, conference call, or chat line platform, even though the carriers are not providing switched access service because none of the parties who are communicating are end user customers residing in the LEC's territory.

Sprint asserts that traffic pumping is illegal. It asserts that, therefore, MIEAC has billed Sprint for call services that are not authorized by its tariffs. Sprint reasons that MIEAC's tariffs are written to authorize billing of switched

access service charges for a typical call when an IXC, such as Sprint, delivers a call to MIEAC for the call to be terminated to the local end user customer of the LEC.  It asserts that, because the telephone call to Tekstar does not terminate with the end user but, instead, is transferred to a CCC, there is no termination and no switched access service.  Sprint asserts that MIEAC charges its highest rates for such traffic, although it is not properly covered by MIEAC's tariff.

MIEAC contends that it has no role with respect to the traffic pumping allegations – it is not involved in the arrangements between Tekstar and its CCCs and it shares no revenue with Tekstar or its CCCs for the Sprint traffic.  MIEAC concludes that Sprint is violating MIEAC's FCC Tariff by withholding payment from MIEAC based on Sprint's objections regarding the nature of services provided by another carrier.

Sprint concludes that it is entitled to recoup or offset the amounts it owes for all of MIEAC's CEA services against amounts Sprint has paid and has been charged for calls to Tekstar.  Therefore, it is withholding all payments to MIEAC for all services until it calculates that it has received proper credit for all Tekstar calls for which it has improperly paid.

### 3.  The Agencies

The FCC has jurisdiction over all interstate and international communications.  47 U.S.C. § 151.  It also has authority over the federal interstate tariffs filed by MIEAC and Tekstar.  See 47 U.S.C. § 201.  The state regulatory commissions, such as the MPUC, regulate intrastate switched access services. See Minn. Stat. § 237.16, subd. 1.

### 4.  Sprint's Dispute with Tekstar

In a 2009 lawsuit between Tekstar and Sprint regarding traffic pumping, the Court explained:

> At the heart of this action is a dispute between the parties regarding whether connection of calls through Tekstar's facilities to certain businesses that provide conference calling and similar services constitutes switched access service under Tekstar's intrastate and interstate tariffs.  Tekstar contends that connection of calls to such businesses constitutes switched access service, meaning Sprint is required to pay terminating access charges to Tekstar pursuant to Tekstar's tariffs.  Sprint disagrees, arguing, among other things, that no switched access service has been provided and that the tariffs are inapplicable because the businesses at issue are not "end users" and calls do not "terminate" with them.  In addition, Sprint contends that Tekstar has an unlawful "traffic pumping" arrangement with these businesses, whereby the businesses generate high volumes of calls by providing conference calling and similar services to others at little or no charge and Tekstar pays the businesses kickbacks from the high levels of tariffs collected.

Tekstar Commc'ns, Inc. v. Sprint Commc'ns Co. L.P., Civil No. 08-1130

(JNE/RLE), 2009 WL 2155930, at *1 (D. Minn. July 15, 2009).  The Court stayed the

case and referred the matter of the applicability of Tekstar's tariff to the FCC

under the primary jurisdiction doctrine.  Id. at *3-*4.

In July 2010, this Court addressed a similar dispute between Qwest

Communications Company, LLC and Tekstar.  See Qwest Commc'ns Co., LLC v.

Tekstar Commc'ns, Inc., Civil File No. 10-490 (MJD/SRN), 2010 WL 2772442 (D.

Minn. July 12, 2010) (the "Qwest/Tekstar" matter).  The Court also stayed the

lawsuit and referred the matter to the FCC for resolution of the relevant

interpretation of Tekstar's FCC Tariff.  Id. at *8.

## 5.    Current Proceedings before the Agencies

The MPUC has taken jurisdiction over a traffic pumping complaint against

Tekstar in In the Matter of the Complaint by Qwest Communications Co., LLC

Against Tekstar Communications, Inc. Regarding Traffic Pumping, Docket No.

P-5096, 5542/C-09-265 (Minn. Pub. Utils. Comm'n) (the "MPUC Proceedings").

Sprint has intervened in the MPUC Proceedings.  The MPUC Proceedings

require the MPUC to decide whether Tekstar's switched access service charges

are consistent with Tekstar's state tariffs, the MPUC Rules, and Minnesota law.

The FCC has considered a scenario of an LEC that paid conference call companies to generate traffic and whose tariffs defined access traffic in materially the same way as Tekstar does.  See, e.g., Qwest Commc'ns Corp. v. Farmers & Merchants Mutual Tel. Co., Second Order on Reconsideration, 24 F.C.C.R. 14801, 2009 WL 4073944 (FCC Nov. 24, 2009) ("Farmers II").  Under the facts of that case, the FCC decided that the free conference call providers in Farmers II were not "end user" "customers" of the LEC under the LEC's tariff and, therefore, the traffic to the conference call providers was not switched access traffic under the tariff.  A number of similar cases have been referred to the FCC by courts across the country, including this Court.  This Court explained its decision to stay and refer the Qwest/Tekstar matter as follows:

> [T]he critical need for the FCC's technical and policy expertise and the importance of uniformity in this developing and hotly contested area (as well as the need for consistency in the Tekstar switched access opinions emanating from the undersigned judge) mandate referral in this case.  This case is one of many that have been referred to the FCC, and the FCC is well-equipped to develop adequate and efficient procedures to address the common issues posed by these numerous referrals.  In the long run, referral promotes efficiency and avoids protracted litigation in an uncertain and technical area of the law.

2010 WL 2772442, at *7.  The Court referred the following issues to the FCC for resolution:

a.      Whether, under the facts of the present dispute between
        Qwest and Tekstar, Tekstar is entitled to collect interstate
        switched access charges it has billed or continues to bill Qwest
        under Tekstar's Access Tariff for calls Qwest's subscribers
        place to Tekstar's CCC customers (i.e., whether Tekstar's
        service with respect to CCCs qualifies as "switched access
        service" within the meaning of Tekstar's Access Tariff);

b.      In the event the services provided by Tekstar to Qwest do not
        qualify as switched access service under Tekstar's Access
        Tariff, a determination of the proper classification of these
        services and whether such services are subject to federal
        tariffing requirements;

c.      In the event the services provided by Tekstar to Qwest are not
        subject to tariffing requirements, whether Tekstar must
        comply with the tariffing requirements, whether Tekstar is
        entitled to compensation under federal telecommunications
        law and, if so, at what level.

Id. at *8.

**B.     Procedural Background**

On June 21, 2010, MIEAC filed a Complaint against Sprint in this Court,

seeking payment from Sprint.  [Docket No. 1]  On July 19, 2010, Sprint filed its

Answer and Counterclaim.  [Docket No. 8]  In its Counterclaim, Sprint alleges

that it is the victim of a traffic pumping scam.  It alleges Count One: Breach of

Federal Tariff Obligation/Contract and Communications Act; Count Two: Breach

of State Tariff Obligation/Contract; Count Three: Negligent Misrepresentation;

and Count Four: Unjust Enrichment. Overall, it asserts that it was wrongfully billed by MIEAC and it does not owe for the calls for which it has been charged.

MIEAC has filed an Amended Complaint alleging: Count One: Collection of Amounts Owed Under Interstate Tariff; Count Two: Quantum Meruit (Alternative Claim); and Count Three: Unjust Enrichment (Alternative Claim). Overall, it alleges that its charges were properly billed to Sprint and are due and owing.

## III.   DISCUSSION

### A.   Motion for Stay

Sprint requests that this Court stay this case pursuant to the primary jurisdiction doctrine so that the FCC and the MPUC can continue to exercise jurisdiction over the Tekstar-related traffic at the heart of this lawsuit.

### 1.   Standard for Primary Jurisdiction

"When it is determined that primary jurisdiction to resolve an issue lies with an agency, a court otherwise having jurisdiction over the case may stay or dismiss the action pending the agency's resolution of the question.  The doctrine is to be invoked sparingly, as it often results in added expense and delay."

10

Alpharma, Inc. v. Pennfield Oil Co., 411 F.3d 934, 938 (8th Cir. 2005) (citations

omitted).

> The doctrine of primary jurisdiction applies where a claim is
> originally cognizable in the courts, and comes into play whenever
> enforcement of the claim requires the resolution of issues which,
> under a regulatory scheme, have been placed within the special
> competence of an administrative body. The contours of primary
> jurisdiction are not fixed by a precise formula. Rather, the
> applicability of the doctrine in any given case depends on whether
> the reasons for the existence of the doctrine are present and whether
> the purposes it serves will be aided by its application. Among the
> reasons and purposes served are the promotion of consistency and
> uniformity within the areas of regulation and the use of agency
> expertise in cases raising issues of fact not within the conventional
> experience of judges or cases requiring the exercise of administrative
> discretion.

Id. (citations omitted).


### 2.    The Issues for Referral

Sprint asserts that the resolution of the switched access claims related to

Tekstar's traffic are the same claims that this Court referred in the Qwest/Tekstar

matter. It argues that, although this lawsuit includes an additional party

involved in funneling traffic over Tekstar's lines, the dispositive inquiries remain

the same: the claims will still depend upon whether switched access service is

being provided as part of Tekstar's traffic pumping scheme. See, e.g., MIEAC

FCC Tariff § 1.2 ("[A]ny switched access services ordered under this tariff must be used with a like switched access service ordered from a [LEC].").

This Court has already held that the question of whether Tekstar's services with respect to the CCCs constitute switched access services within the meaning of Tekstar's tariff is subject to referral under the primary jurisdiction doctrine. Therefore, the Court must first resolve the question of whether MIEAC's tariff makes its service dependent on Tekstar's in order to decide whether there is a basis for a stay.

### 3.  Whether MIEAC's Tariff Is Dependent on Tekstar's Tariff

MIEAC claims that its tariff defines its service offering as limited to the carriage of calls from MIEAC's long distance carrier customers to the point where MIEAC hands the call off to an LEC.  (MIEAC FCC Tariff § 1.2.)  MIEAC's tariff explicitly states that the service provided thereunder "does not constitute a joint undertaking" with Tekstar or any other LEC.  (Id.)  MIEAC concludes that its service is not dependent on Tekstar's service.

MIEAC's FCC Tariff provides:

Section 1.2

The provision of such services by MIEAC as set forth in this tariff is subject to the availability of facilities and does not constitute a joint

12

undertaking with the customer or the Routing Exchange Carriers for the furnishing of any service.

Switched access services provided under this tariff cover only the use of MIEAC's central access tandems, the switched transport between an MIEAC Toll Transfer Point (TTP) and such central access tandem, and the Iowa Network MIEAC Common Channel Signaling Access Network.  End Office switches served by MIEAC's central access tandem are operated by the appropriate Routing Exchange Carrier.  Therefore, any switched access services ordered under this tariff must be used with a like switched access service ordered from a Routing Exchange Carrier or vice versa.

MIEAC's FCC Tariff further provides that "'Routing Exchange Carrier' denotes the Exchange Telephone Company in whose Exchange a Customer's End Users and End Office Switch(es) are located and which routes calls to and from MIEAC's facilities."  (Id. § 2.6.)  The tariff also explains that "Exchange Telephone Company" means a "carrier that provides service within a telephone exchange, or within a connected system of telephone exchanges within the same exchange area operated to furnish to subscribers intercommunicating service of the character ordinarily furnished by a single exchange and which is covered by the exchange service charge."  (Id. § 2.6.)  The parties agree that the terms of MIEAC's state tariff are substantially the same.

Sprint asserts that its End User is the customer at the termination of the call.  The FCC is currently considering IXCs' claims that Tekstar is not an End

User, nor is the CCC to whom it connects.  Sprint's End User is often not located in the telephone exchange belonging to Tekstar.  If Tekstar is not meeting its tariff, then, under MIEAC's FCC Tariff, Tekstar is not an Exchange Telephone Company, yet the tariff provides that "Switched Access Service, when combined with the services offered by Exchange Telephone Companies, is available to customers."  (MIEAC FCC Tariff § 6.1.)

MIEAC argues that Sections 1.2 and 2.1 provide notice to MIEAC's customers that they must order separate service from the LEC for the transport of the call by the LEC from the point where the LEC takes the call from MIEAC across the LEC's network to the called party serviced by the LEC.  MIEAC concludes that the LEC provides the last link of the call path to the customer, whether that customer is an end user or a CCC.

The Court concludes that, read together, the tariff states that switched access is provided under the tariff when there is completion of the telephone call to "end users" and in conjunction with switched access from an LEC.  Whether MIEAC is providing switched access service, and, thus, can charge for switched access service, depends upon whether the LEC – Tekstar – is also providing switched access service.

MIEAC notes that its tariff specifically disclaims any interdependency between MIEAC's tariffed services and the services of any LEC: "The provision of such services by MIEAC as set forth in this tariff . . . does not constitute a joint undertaking with the customer or the Routing Exchange Carriers [i.e. LECs] for the furnishing of any service."  (MIEAC FCC Tariff § 1.2.)  (See also id. § 2.1.3(B) ("MIEAC shall not be liable for any act or omission of any other carrier or customer providing a portion of a service, nor shall MIEAC for its own act or omission hold liable any other carrier or customer providing a portion of a service."); id. § 2.1.1(B) ("MIEAC shall be responsible only for the installation, operation, and maintenance of the service it provides.").)

MIEAC's tariff does make clear that it is not liable for actions by Tekstar. However, the question before the Court is not whether MIEAC is somehow liable for a tort or breach of contract by Tekstar.  The issue is whether the calls routed through MIEAC to Tekstar are properly characterized as switched access calls, to which MIEAC's tariff applies.  Section 1.2's "joint undertaking" language reflects the unitary nature of the calls by putting the customer on notice that an identified Routing Exchange Carrier must also participate in order to complete the call.  Section 2.1's disclaimer of liability means that MIEAC will not be liable

for damages caused by another carrier's service.  Sprint is not seeking to hold

MIEAC liable for Tekstar's service.  Instead, it is seeking to hold MIEAC to the

terms of MIEAC's tariff.

MIEAC also argues that Sprint's interpretation of MIEAC's tariff is

irrational because it would make MIEAC's customers' receipt of service from an

LEC a necessary component of MIEAC's own services.  Under this reading, if an

LEC fails to offer a service consistent with its tariff, MIEAC can be said to have

not provided its tariffed service to its customer.  MIEAC asserts that it would be

illogical for it to limit its ability to collect for its services based on other carriers,

over which MIEAC has no control, complying with their own tariffs.

While in non-regulated business interactions, MIEAC's claim that it would

be illogical to condition the lawfulness of MIEAC's service and its right to be

paid on the lawfulness of a third party's services over which it has no control

might hold water, such an arrangement can be logical in the telecommunications

tariff context when the question is the overall categorization of the entire call at

issue.  See Iowa Network Servs., Inc. v. Qwest Corp., 466 F.3d 1091, 1095-96 (8th

Cir. 2006) (holding that CEA – intermediary – providers, cannot collect a

regulated access charge if the call is not subject to access, so even when CEA

intermediary provider completed its task of delivering call to LEC, it could not collect tariff charges from Qwest if the traffic was not access traffic, and rejecting CEA provider's assertion that its access tariff required Qwest to compensate it for all traffic it delivered to CEA provider regardless of the nature of the call).

It is the regulatory system, not the carrier's business motives, that dictates when regulated charges can be collected.  Here, the traffic in dispute may be outside the switched access definition because the calls are not made to end users of local exchange service under Tekstar's tariffs, and thus do not qualify as access calls.

### 4.    Whether Referral Is Appropriate

MIEAC further asserts that its tariff raises no technical regulatory tariff terms or agency expertise.  It claims the Court simply must answer a question of contract law: can one document (MIEAC's FCC Tariff) be read to incorporate the terms of another document (Tekstar's FCC Tariff) by reference?  It claims that the question is simply how this particular document should be interpreted; there is no issue of the entire industry's rate structure.  The Court disagrees.

The interpretation of MIEAC's rate is a key piece of the FCC's overall policy towards traffic pumping and how such traffic should be treated.  The FCC

is in the process of determining the appropriate strategy for addressing traffic

pumping   See In re Connect America Fund, WC Dkt. No. 10-90, et al., FCC 11-13

¶¶ 635-77 (Feb. 9, 2011) (Notice of Proposed Rulemaking including section

entitled "Rules to Reduce Access Stimulation").  The question of how the portion

of such a call that travels through MIEAC's facilities fits into the overall tariff

structure is inexorably tied to the larger policy picture of how these calls should

be treated and how CEA service providers, such as MIEAC, fit into the overall

call structure.  See Far E. Conference v. United States, 342 U.S. 570, 573-74 (1952)

(holding that interpretation of international shipping rate in that case "may

depend upon a consideration of economic relations, of facts peculiar to the

business or its history, of competitive conditions in respect of the shipping of

foreign countries, and of other relevant circumstances, generally unfamiliar to a

judicial tribunal, but well understood by an administrative body especially

trained and experienced in the intricate and technical facts and usages of the

shipping trade, and with which that body, consequently, is better able to deal").

See also Qwest/Tekstar, 2010 WL 2772442, at *5 ("Not only will technical

expertise be required to analyze the claims in the case, but also, FCC regulatory

policy will necessarily come into play.  See Tekstar Commc'ns, Inc., 2009 WL

2155930, at *2. ("Determination of whether the [switched access] services . . . are

covered by Tekstar's tariff will require consideration of how those services fit

into the larger regulatory regime.") (citations omitted).  The FCC is uniquely

qualified to make this determination.").  The FCC will be determining how

Tekstar and the CCCs fit into the larger regulatory scheme; it will be examining

traffic pumping and CCC service as a whole and how they play into the overall

tariff system.  It would be logical and consistent for the FCC to also determine

how intermediaries, such as MIEAC, fit into that regulatory scheme.  The FCC is

in the best position to make such a policy determination.

Deference to the FCC and MPUC is particularly appropriate in this case

because actions to resolve the same question of the categorization of Tekstar

traffic are already pending before the MPUC and FCC.  See MCI Commc'ns

Corp. v. AT&T Co., 496 F.2d 214, 223 (3d Cir. 1974) ("In addition to the above-

enumerated reasons why the district court should have applied the doctrine of

primary jurisdiction in the instant case, we have concluded that the initiation of

proceedings by the FCC . . . made application of the doctrine even more

appropriate.").  Both the FCC and the MPUC are considering the dispositive

regulatory question in this case: does pumped traffic qualify as switched access service?

If the Court addressed the parties' dispositive motions at this point, there is the possibility that this proceeding could conflict with this Court's ruling in the Qwest/Tekstar matter and with the ongoing regulatory proceedings. Irreconcilable orders would confuse the complex regulatory environment affecting the telecommunications industry.

The Court stays this case because MIEAC's FCC Tariff relies upon certain terms that are defined by whether Tekstar meets its tariff, and because the FCC is already in the process of examining not only whether Tekstar, and others like it, meet their tariffs when they carry CCC calls, but also traffic pumping as a whole. Because the FCC will be making policy decisions about how traffic pumping calls should be treated with regard to the CCC companies and the LECs connected to them, such as Tekstar, the primary jurisdiction doctrine provides that the FCC examine how the entire CCC call should be treated from the IXC to intermediaries, such as MIEAC, to Tekstar to the CCC, so that the treatment of the calls is unitary and logical from head-to-tail.

Technically, services under MIEAC's FCC Tariff must involve completion of the telephone call to "end users" and "subscribers" and in conjunction with switched access from an LEC.  The FCC will determine whether Tekstar does provide switched access service and whether CCCs are end users.  If the FCC determines that Tekstar does provide switched access service, then MIEAC's claim against Sprint will succeed.  If the FCC decides that Tekstar does not provide switched access service, then the question is whether the technical, rigid meaning of MIEAC's FCC Tariff should be enforced – because Tekstar does not provide switched access service to Sprint, then MIEAC's FCC Tariff does not apply – even though the outcome may appear unjust.  As the Eighth Circuit held in <u>Iowa Network Services</u>, however, it is the categorization of the call that determines whether the tariff applies, even if the CEA provider completed the requested "task" of delivering the call.  Here, there exists a policy issue that the FCC is best equipped to decide: how should CEA providers who unwittingly charge for traffic-pumping calls be paid by IXCs?

Because the Court concludes that the meaning of "switched access service" and/or "end user" is material to the applicability of MIEAC's tariff and because the FCC is already in the process of examining the overall regulatory scheme for

21

traffic pumping calls, of which this case is a part, the Court will stay this proceeding.

### B.      Motion to Dismiss Sprint's Counterclaims

MIEAC has filed a motion to dismiss all of Sprint's counterclaims.  MIEAC provides various arguments to support its theory that Sprint's counterclaims fail to state claims upon which relief can be granted.  However, a material issue with regard to each counterclaim is whether MIEAC's tariffs apply to the Tekstar calls. Therefore, it would be premature for the Court to address the viability of Sprint's counterclaims at this point.  The Court denies MIEAC's Motion to Dismiss without prejudice for MIEAC to re-file the motion after the stay is lifted.

### C.      Motion for Partial Summary Judgment

MIEAC moves for summary judgment on Count One of the Amended Complaint for the entire billed amount that Sprint has failed to pay MIEAC, including both Tekstar and non-Tekstar calls, for the additional finance charges through April 1, 2011, and any additional charges that have accrued since April 1, along with new late fees.  It further requests that the Court enjoin Sprint from withholding payment for access services provided by MIEAC because of disputes Sprint is having with LECs to whom the traffic is routed.

In the alternative, MIEAC moves for partial summary judgment on Count One in the amount of the non-Tekstar traffic MIEAC has handled for Sprint, the finance charges on that non-Tekstar traffic, and any additional amounts that have accrued since April 1, along with late fees.  It asks that the Court enjoin Sprint from withholding payment for access services provided by MIEAC because of disputes Sprint has with the LECs to whom other traffic is routed.

Based on this Court's decision on the motion to stay, it is premature for this Court to decide whether Sprint should pay MIEAC for the Tekstar traffic that MIEAC has and is handling for Sprint.  Therefore, MIEAC's motion for summary judgment on Count One is denied without prejudice.

In the alternative, MIEAC argues that the question of whether Sprint is permitted to withhold payment for calls that both parties agree are covered by MIEAC's tariff, as a form of self-help for the allegedly improper charges for the Tekstar calls, is wholly separate from the issues that this Court has referred to the FCC.  The Court cannot address MIEAC's alternative motion for partial summary judgment at this time because Sprint has pled the affirmative defenses of setoff and recoupment, and MIEAC has not shown that those defenses are invalid.  "Recoupment is a defense that goes to the foundation of plaintiff's claim

by deducting from plaintiff's recovery all just allowances or demands accruing to

the defendant with respect to the same contract or transaction." Distrib. Servs.,

Ltd. v. Eddie Parker Interests, Inc., 897 F.2d 811, 812 (5th Cir. 1990) (citation

omitted). The Court cannot dispose of Count One by granting summary

judgment to MIEAC unless all of Sprint's affirmative defenses to Count One are

legally insufficient. See In re Lull Corp., 52 F.3d 787, 789 (8th Cir. 1995). The

Court cannot rule on the merits of Sprint's recoupment and setoff defenses

without addressing the very issues that are referred to the FCC. Sprint's

affirmative defenses preclude partial summary judgment as requested by

MIEAC.

Accordingly, based upon the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED**:

1. Defendant's Amended Motion for Stay [Docket No. 56] is **GRANTED**.

2. This action is **STAYED** pending (i) resolution of the dispute by agreement of the parties; (ii) a decision on the disputed issues by the FCC pursuant to the referral described below; or (iii) further order of the Court.

3. This matter is referred to the FCC for resolution, to the extent the FCC's jurisdiction permits, of the following issues:

a.  Whether, under the facts of the present dispute between MIEAC and Sprint, MIEAC is entitled to collect interstate CEA switched access charges it has billed or continues to bill Sprint under MIEAC's FCC Tariff for calls Sprint's subscribers place to Tekstar CCC customers.

b.  In the event the services provided by MIEAC to Sprint do not qualify as CEA switched access service under MIEAC's FCC Tariff, a determination of the proper classification of these services and whether such services are subject to federal tariffing requirements.

c.  In the event the services provided by MIEAC to Sprint are not subject to tariffing requirements, whether MIEAC must comply with the tariffing requirements, whether MIEAC is entitled to compensation under federal telecommunications law and, if so, at what level.

4.  MIEAC shall contact the Market Disputes Resolution Division of the FCC to obtain guidance regarding the appropriate method for bringing this matter before the FCC.  MIEAC shall initiate proceedings as recommended by the Market Disputes Resolution Division within 30 days of the date of this Order. MIEAC is directed to furnish the FCC with a copy of this Order as part of its submission.

5.  The parties shall submit a joint report to the Court every three months describing the status of the proceedings before the FCC, the first of which shall be filed no later than three months from the date of this Order.

6.  Plaintiff's Amended Motion to Dismiss Counterclaim [Docket No. 58] is **DENIED WITHOUT PREJUDICE**. Plaintiff may renew its motion when the stay of litigation has ended.

7.      Plaintiff's Motion for Partial Summary Judgment [Docket No. 63] is **DENIED WITHOUT PREJUDICE**.  Plaintiff may renew its motion when the stay of litigation has ended.


Dated:   August 15, 2011            s/ Michael J. Davis
                                    Michael J. Davis
                                    Chief Judge
                                    United States District Court